OPINION OF THE COURT
Jerome L. Steinberg, J.
By these two small claims actions, a landlord seeks to recover, from the City of New York (Department of Social Services), rent arrears of two welfare recipients who vacated his premises while allegedly owing him rent. In SC K 5838/79, the amount claimed is $474 and the tenant was one Catherine Zacona; in SC K 5839/79, the amount claimed is $90 and the tenant is one Luba Simco.
*373 The Department of Social Services (DSS) moves to dismiss both complaints for failure to state a cause of action. The essence of its argument is that there is no privity between landlord (claimant) and the city, and that the city is not a proper party to these proceedings.
It appears that both tenants had previously used moneys allocated for rent for other purposes. When the landlord instituted summary proceedings, the DSS allocated additional money to pay the arrears, rather than permit the eviction of the tenants. Thereafter, DSS notified landlord, in writing, that two-party checks would be issued, which would require the signature of both landlord and tenant, for that portion of their welfare allotments allocated to rent.
The purpose of these checks is to prevent tenant from misallocating funds. This protects DSS from the necessity of paying rent moneys twice, but it also serves as a representation to landlord that future rent moneys cannot be spent elsewhere. It would fly in the face of reality to assert that such two-party checks are not intended — in part, at least — as an inducement to landlord (1) not to commence eviction proceedings immediately upon the commencement of the new rental period; and (2) to accept semimonthly rent installments despite the fact that lease agreements invariably require rent to be paid monthly, in advance.
In K 5839/79, landlord has the two-party check, which was delivered to the premises after tenant vacated, allegedly without notice; in K 5838/79, the two-party check was changed to a one-party check (payable to tenant-welfare recipient) without notice to landlord. We will discuss the latter case first.
Once DSS undertook to notify landlord of the issuance of two-party checks, landlord had a right to rely upon the assurances that this type of check offers, until such time as he is notified that such method of payment will cease. In this way, the landlord can take whatever steps he deems appropriate to protect his financial interests. Indeed, the notice to landlord of the issuance of two-party checks specifically states that landlord will be notified prior to termination of this method of payment.
Nowhere in its moving papers does the city allege that such notice of termination was ever sent. On the contrary, landlord alleges (and is not contradicted) that in a telephone conversation initiated by him, after the tenant vacated, he was informed by an assistant director of social services that DSS *374 changed tenant to one-party check status in order to allow tenant to pay moving expenses with the money, instead of paying rent.
In so doing, the DSS participated in a fraud upon landlord; scheming with tenant to utilize money, to which landlord had a lawful claim, for another purpose, knowing fully well that any judgment which landlord might obtain against tenant would not be worth the paper it is written on. This in direct contravention of the city’s representation to landlord that he would be notified prior to any such change in tenant’s welfare payments. It was calculated to save the DSS from providing tenant with moving money by cheating the landlord out of what was rightfully his due.
This behavior by DSS is not new. Dating back to the time the writer was in private practice (more than 20 years ago), the then Department of Welfare, actively or passively (but most certainly knowingly), participated in schemes whereby unsuspecting landlords, acting in good faith, in reliance upon assurances from city social workers that checks were being processed, had withheld evicting welfare tenants, only to have the tenant move in the interim, with landlord holding the bag for rent arrears of from one to six months or more.
The court has little doubt that such conduct has, in no small measure, contributed to the abandonment of so many buildings in our city, which results in: (1) erosion of our tax base; (2) economic hardship to both landlord and mortgagee; and (3) scarcity of housing stock, especially that which serves those in the lowest socio-economic strata.
It is high time that supposedly responsible public employees began to act morally and responsibly; it is high time the courts stopped closing their eyes to an unconscionable situation.
In 10 years on the Bench, we have seen numerous abuses by business and the public in attempts to capitalize upon real or imagined loopholes in the law, in order to dupe the unsuspecting out of what they were legally, or at least morally, entitled to. Sometimes the courts are powerless to prevent such defarious behavior. Indeed, both our city and State governments have established consumer protection agencies in an effort to protect the public. Such chicanery, when induced by the profit motive, while hardly laudable, is at least understandable. Does not the public have a right to expect a higher standard of conduct from government itself? Are we not entitled to expect *375 government, whose sole reason for existence is to serve the public, to act morally in its dealing with its citizens? By no stretch of the imagination has DSS acted morally in this instance.
The city’s claim of lack of privity is inappropriate. Having undertaken to changing a welfare recipient’s rent allotment to two-party status and promising, in writing, to advise landlord of any change in that status, the DSS is liable to landlord for any loss incurred by landlord in reliance thereon. To say there was no privity is to close our eyes to the truth. At the very least, landlord is a third-party beneficiary of that part of the relationship between DSS and the welfare client. (Lawrence v Fox, 20 NY 268.) In addition, we think the city is liable to landlord in tort. One who, by its wrongful conduct induces another to act to its detriment should be answerable in damages to the aggrieved party. It is basic tort law that one who induces another to breach its contract is liable to the wronged party regardless of privity. The tests for the tort of inducing breach of contract are "(1) the existence of a valid contract * * * (2) the defendant’s knowledge of that contract; (3) the defendant’s intentional procuring the breach * * * (4) damages”. (Israel v Wood Dolson Co., 151 NYS2d 1, 5.) In this case, at the very least, we have (1) a month-to-month lease (contract), (2) knowledge of the lease by the defendant, as shown by two-party checks, (3) a unilateral termination of two-party checks without notice to landlord, and (4) damages in the amount sued for.
Accordingly, in the case of SC K 5838/79 (Zacona), the court awards judgment to claimant against the defendant City of New York (DSS) in the sum of $474 plus disbursements.
The case under Index No. SC K 5839/79 (Simco) presents a different problem. In this instance, there was no participation by DSS in a fraud. Rather, we have a tenant who allegedly moved, without notice to landlord, while two-party checks were still in effect. The check in question was delivered after tenant moved, and is in landlord’s possession. As adduced in oral argument, the tenant refuses to sign this two-party check, alleging she was not a tenant during the period of time covered by the check in question. If she does not sign the check, it cannot be cashed by landlord. Ultimately it will become "stale” and the welfare recipient will be credited with the amount thereof, which represents a portion of her monthly allotment.
*376 In this instance, the city’s argument of lack of privity is, perhaps, on more solid ground. However, we must again look to the effect of any ruling rendered by the court. Here again, if landlord is compelled to proceed solely against tenant, any judgment he may recover would undoubtedly be worthless.
As Judges, we are repeatedly reminded in judicial seminars and in conferences with our administrators that Small Claims Court is a "People’s Court”. The aim is "substantial justice” rather than legal technicalities. With this caveat in mind, the court rules as follows:
The clerk of Small Claims Court is directed to issue a supplemental or additional summons to claimant against Luba Simco, the former tenant, for the first available court date (upon the payment of the requisite fee). This action is adjourned to the return date of that summons. DSS is directed to stop payment on the two-party check in question and hold the amount thereof as a stakeholder. DSS shall distribute the proceeds thereof in accordance with the determination of the court (or arbitrator).